**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION, ASHLAND**

| | | |
|---|---|---|
| **JAMES HAYES** | ) | |
| | ) | **Case No.:** |
| Plaintiff, | ) | |
| | ) | **Judge:** |
| v. | ) | |
| | ) | **PLAINTIFF'S COMPLAINT** |
| **ENDOLOGIX INC.** | ) | **AND JURY DEMAND** |
| | ) | |
| Defendant. | ) | |

Plaintiff, by and through counsel, and for his complaint against Defendant, alleges as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff James Hayes is a resident and citizen of Flatwoods, Kentucky in Greenup County, Kentucky.

2.      Plaintiff alleges an amount in controversy in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

3.      Defendant Endologix, Inc. ("Endologix") is a Delaware corporation with principal executive offices at 2 Musick, Irvine, California 92618. Endologix develops, manufactures, markets, and sells medical devices primarily for the treatment of aortic disorders. Defendant is a resident and citizen of Delaware and California.

4.      At all times relevant, Endologix was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related

1

entities, abdominal aortic aneurism ("AAA") repair products, including the Endologix AFX® Endovascular AAA System ("AFX" system/device).

5.      This court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue in this district is appropriate under 28 U.S.C. §1391 because a substantial part of the events giving rise to this claim occurred in this district and the Ashland jury division.   Specifically, Plaintiff James Hayes received medical care and treatment in this venue.

## FACTUAL BACKGROUND

7.      An aneurysm occurs when an artery wall weakens, which allows the artery to abnormally balloon or widen.

8.      Aneurysms are a serious medical condition as they may rupture causing internal bleeding that can be fatal. This is particularly true when an aneurysm occurs in the aorta, which is the main and largest artery in the body.

9.      Due to the risk of an aneurysm rupture, individuals with unruptured aneurysms may require surgery to repair, treat, and/or reinforce the artery wall.

10.     Medical devices have been developed to protect against ruptured aneurysms. In basic terms, these devices often function similar to a hose inserted into a damaged artery, which permits blood to flow through the "hose" thereby avoiding the damaged portion of the artery.

11.     Endovascular repair is a common surgical technique for AAA repairs wherein the surgeon implants an aneurysm repair graft device by inserting the device

2

through an artery in the patient's leg and threading it up into the aorta/aneurysm.

12.     After endovascular repair of an AAA, some individuals experience complications known as endoleaks.

13.     Endoleaks occur when blood continues to remain or flow into the aneurysm cavity after endovascular repair.

14.     There are multiple types of endoleaks, which are routinely classified from Types I – IV (illustrated below).



Type I endoleak     Type II endoleak     Type III endoleak     Type IV endoleak

Source: Brunicardi FC, Andersen DK, Billiar TR, Dunn DL, Hunter JG, Matthews JB, Pollock RE: *Schwartz's Principles of Surgery, 9th Edition:* http://www.accessmedicine.com

15.     Type I endoleaks occur when a gap between the repair graft and the vessel wall allows blood to flow into the aneurysm cavity.

16.     Type II endoleaks occur when blood from a collateral vein flows into the aneurysm cavity. These are the most common type of endoleak and are typically considered to be benign.

17.     Type III endoleaks are attributed to device failures and occur when there is either a separation between the graft components (Type IIIa) or when there is a tear or hole in the graft material (Type IIIb). Type III endoleaks can result in aneurysm

3

expansion and rupture. For this reason Type III endoleaks require urgent or emergency medical attention.

18.     Type IV endoleaks occur when blood flows through the pores of the graft material and often resolve without intervention.

19.     On or about July 9, 2014, Plaintiff James Hayes, was found to have an asymptomatic infrarenal abdominal aortic aneurysm and as a result underwent endovascular AAA repair.

20.     At his surgery, Plaintiff Hayes received an AAA repair device designed, manufactured, marketed and sold by Endologix. Plaintiff Hayes' AAA repair consisted of an Endologix AFX main body graft made with Strata and an Endologix AFX aortic extension graft made with Strata.

21.     On May 1, 2018, Plaintiff visited his physician for a routine follow up appointment.  A CT scan was performed which revealed that the Endologix AFX device had a Type III Endoleak, resulting in an increase in size of his AAA and placing him at serious risk of further medical complications.

22.     If provided an adequate warning or instruction of the risks of Endologix AFX device, Plaintiff Hayes and/or his physicians would have not have chosen the Endologix AFX device, but would rather have pursued a safer alternative to treat his AAA, including but not limited to open repair or an alternative endovascular AAA repair devices.

23.     As a direct and proximate result of the failed and defective Endologix device, Plaintiff James Hayes had to undergo a second surgery to repair the failed device and prevent rupture of his AAA.

24.     On May 8, 2018, Plaintiff underwent revision surgery to repair the failed and defective Endologix AFX device, wherein his surgeon inserted a competitor's AAA repair device inside of the failed and defective Endologix device.

25.     As a direct and proximate result of the failed and defective Endologix AFX device, Plaintiff James Hayes has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment.

26.     As a direct and proximate result of the failed and defective Endologix AFX device, Plaintiff James Hayes has suffered significant mental anguish and emotional distress and will continue to suffer physical limitations, pain, injury, damages, harm, and mental and emotional distress in the future.

27.     As a direct and proximate result of the failed and defective Endologix AFX device, Plaintiff James Hayes has also incurred medical expenses and other economic harm, and will continue to incur such expenses and other economic harm in the future.

## THE ENDOLOGIX AFX ENDOVASCULAR AAA SYSTEM

28.     On or about January 8, 2004 Defendant submitted a premarket approval application (PMA) to the United States Food and Drug Administrations (FDA) under Section 515 of the Federal Food, Drug, and Cosmetic Act for a device it branded the PowerLink® AAA System. See 21 U.S.C. § 360e et seq.

29.     On or about October 29, 2004 Endologix received marketing approval from the FDA (subject to Defendant's adherence to additional Conditions of Approval) for its PowerLink AAA System under Section 515 of the Act.

30.     Pursuant to the approval process, Defendant was responsible for

complying with the Act's requirements, including but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); recalls (21 CFR Part 806), good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820), and the Conditions of Approval imposed in the devices approval letter.

31.     In order to expand its product line and "give [its] sales force a powerful new tool to continue expanding [its] market share" Endologix developed a new AAA repair product called the AFX Endovascular AAA System. See, Endologix Q2 2011 Earnings Call Transcript at p. 2.[1]

32.     Although Endologix considered the AFX device to be a new product it did not submit a separate PMA application for the AFX system. Instead, on or about December 12, 2010, Defendant submitted a 180-Day Track PMA Supplement (Supplement-031)      to      enact      a      "Process      Change      – Manufacturer/Sterilizer/Packager/Supplier" for the PowerLink AAA System.

33.     Supplement-031 was approved on May 6, 2011 and shortly thereafter in August 2011 Endologix began marketing the device as the AFX Endovascular AAA System.

34.     The AFX Endovascular AAA System is comprised of a main bifurcated stent graft that is constructed with a self-expanding stent cage walled with an expanded polytetrafluoroethylene (ePTFE) graft material. The system also includes several similarly made accessory and extension stent graft devices for additional patient customization.

35.     The devices (as illustrated below) were intended to treat AAAs by

---

[1] Available at: www.sec.gov/Archives/edgar/data/1013606/000144530511002193/calltranscript992.htm

providing a new path for the blood to flow so it does not fill and expand the aneurysm.



36.    Defendant developed its own proprietary ePTFE graft material that it trademarked as Strata™.

37.    The Strata graft material was originally developed for a separate Endologix AAA repair device called the Ventana™ Fenestrated Stent Graft System.

38.    The Ventana device never made it to the U.S. market because its original clinical testing was discontinued due to the high rate of failure that was attributed in part to "graft material wear and perforation." See, Endologix 11/20/2013 Conference Call Transcript.[2]

39.    As a result, the AFX System was the first marketed device to employ the Strata material.

40.    Almost immediately after the AFX device's market introduction,

---

[2] Available at:
www.sec.gov/Archives/edgar/data/1013606/000101360613000070/ex991elgx2013investormeeti.htm

Endologix began receiving an increased number of Type III endoleak reports with the device.

41.     In the AFX device's first year on the market, Endologix had already received at least 16 reports of Type III endoleaks with the device.  By just the AFX device's second marketed year, Endologix had received at least 89 reports of Type III endoleaks with the device.

42.     In comparison, the predecessor PowerLink system reported only roughly 73 Type III endoleaks in the entire nine years it had been on the market – an average of approximately 8 per year.

43.     Notwithstanding its own internal data and research demonstrating the AFX device's defectiveness, Endologix continued to manufacture and sell the devices made with the Strata material and did not inform healthcare providers or patients of the increased risk.

44.     Instead, Endologix advertised the new device as having "advanced clinical performance" and touted the supposed benefits of the AFX device's new Strata ePTFE graft material. Endologix's website and marketing materials represented its "new proprietary Strata graft material" as a "durable highly conformable ePTFE that enhances seal."

45.     Upon information and belief, in 2014, while making no reference to the high failure rate of its Strata grafts, Endologix submitted to the FDA a 30-day process change notice for the AFX device. After this notice, Endologix ceased manufacturing the AFX with Strata and began manufacturing the AFX device with Duraply™ ePTFE graft material.

46.     At the time Endologix failed to notify physicians/patients of the change, the reason for the change, or the increased risk of Type III endoleaks with the Strata material.

47.     As a result, AFX devices made with Strata remained in the stream of commerce and continued to be implanted into patients.

48.     On or about December 30, 2016, two years after Defendant ceased manufacturing the AFX with Strata, Defendant issued a letter notifying physicians that it was recalling all AFX devices made with the Strata graft material, including the devices implanted into Plaintiff Hayes.

49.     Endologix issued this recall only after it received notice from the European Union on December 13, 2016 that the company would be receiving a suspension of its CE Mark for the AFX system due to reports of Type III endoleaks in the AFX devices manufactured with Strata.

50.     The FDA has identified the recall of the AFX devices made with Strata as a Class I recall, finding that the use of the devices may cause serious injuries or death.

51.     FDA's classification of the AFX device's recall as Class I establishes that the device as manufactured and/or designed was adulterated. 21 CFR § 7.3(m)(1).

52.     FDA's classification of the AFX device's recall as Class I establishes that the device as manufactured and/or designed was misbranded. 21 CFR § 7.3(m)(1).

53.     In this December 30, 2016 letter to physicians, Defendant informed doctors for the first time that the reported rate of Type III endoleaks with AFX devices made with Strata was substantially increased as compared to other devices, providing the following information:

9





| Event Type | AFX Product Version | | |
|---|---|---|---|
| | AFX System + Strata Rate* | AFX System + Duraply Rate* | AFX2 System Rate* |
| Type IIIa Endoleak | 1.54% (366/23,828) | 0.20% (34/17,139) | 0.02% (1/4143) |
| Type IIIb Endoleak | 1.34% (320/23,828) | 0.19% (33/17,139) | 0% (0/4143) |

*Rate: Total Events Reported/Total Bifurcated Units Sold (1 required per case)

54.     On June 19, 2018, the FDA communicated that the increased risk for Type III endoleaks with endovascular graft systems appeared to be specific to the Endologix AFX device made with Strata. The FDA concluded that "the Endologix AFX with Strata device is at greater risk for a Type III endoleak compared to other endovascular AAA graft systems." See, 6/19/2018 FDA Update Letter.[3]

55.     Defendant was well aware before Plaintiff Hayes was implanted with the defective AFX device that the Strata material was failing at an unacceptable rate. Rather than properly recalling the device and/or informing patients and physicians of this risk and the availability of alternative products, Endologix instead attempted to covertly modify the defective, adulterated, and/or misbranded device without raising suspicion or hurting its sales and goodwill.

56.     In a letter issued to physicians on July 20, 2018, Defendant admitted for the first time that:

> "Endologix has taken a number of actions in recent years [referring back to at least 2013] to address Type III endoleaks with the AFX System. These have included changes to the system's Instructions for Use (IFU) as well as product modifications intended to help prevent the occurrence of Type III endoleaks such as changing from the original graft material processing referred to as Strata (AFX system with Strata) to an improved process known as Duraply..."

57.     As a direct and proximate result of the failed and defective Endologix device, Plaintiff Hayes suffered physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

---

[3] Available at: https://www.fda.gov/MedicalDevices/Safety/LetterstoHealthCareProviders/ucm611039.htm

### Parallel Federal Requirements

58.     Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See 21 U.S.C. § 351.

59.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. § 352.

60.     Pursuant to federal law, the FDA imposed several other additional requirements upon Endologix as Conditions of Approval of the PowerLink/AFX device. The FDA specifically stated in its approval letter for the device that "failure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act." The FDA's letter further provided that the Center for Devices and Radiological Health of the FDA "does not evaluate information related to contract liability warranties, however, you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."

61.     Pursuant to federal law, the AFX system's Conditions of Approval require Endologix to submit a PMA Supplement when unanticipated adverse effects, increases in the incidence of anticipated adverse events, or device failures necessitate a labeling, manufacturing, or device modification.  In accordance with federal law, a medical device manufacturer may submit a PMA Supplement to change a devices

warning without prior FDA approval. 21 CFR § 814.39(d)(2).

62.     Upon information and belief, after receiving information concerning the increased incidence of Type III endoleaks with the AFX device, Endologix failed to submit a PMA supplement to adequately apprise the Plaintiff and his doctor of the increased risk of Type III in violation of its legal obligations.

63.     Pursuant to federal law, the AFX system's Conditions of Approval require that Endologix create and implement a training program for clinicians. Endologix was further required to evaluate the adequacy of the training program, and if modifications were necessary to the program, Endologix was to describe and justify each modification in its annual report.

64.     Upon information and belief, in violation of its legal obligations Endologix failed to adequately monitor the adequacy of its training program and similarly failed to adequately modify its training program. Defendant admitted in its July 20, 2018 letter to physicians that certain surgical methods may be associated with Type III endoleaks.

65.     Pursuant to federal law, the AFX system's Conditions of Approval require Endologix to create and provide a clinical update to physicians at least annually. In addition to other information, this update was specifically required to provide physicians relevant information from Endologix's commercial experience (adverse event reporting). Upon information and belief, Endologix failed to adequately comply with these federal requirements and instead attempted through numerous methods to conceal in its annual clinical update to physicians the increased risk of Type III endoleaks with the AFX device.

66.     First, despite the PowerLink and AFX devices' different designs and

ePTFE graft materials, Endologix combined the two devices' number of endoleak reports and number of distributed devices.  As a result, Endologix disclosed only a collective reporting rate.  By revealing only a collective reporting rate, Endologix diluted the data and concealed the increased risk for Type III endoleaks for the AFX device as compared to the PowerLink system.

67.   Second, Endologix further suppressed the real reporting rate of Type III endoleaks with the AFX system by calculating the failure rate based on the number of devices distributed, rather than basing its analysis upon the number of devices actually implanted into patients.

68.   By using the total number of distributed devices, Endologix included in its rate calculation numerous AFX devices that were not yet (or never would be) implanted into patients and thus could not report any endoleaks failure. This method of calculation severely reduced the true rate of implanted AFX devices reported with a Type III endoleak. In its 2016 letter to physicians, Endologix admitted that rates calculated "based on voluntary reporting and units sold instead of implanted…may underestimate the true event rate occurring on a per-patient basis."

69.   Endologix was entirely capable of providing the true reporting rate based off the actual number of implanted devices as it was fully aware of the number of devices actually implanted into patients. As a matter of fact, Endologix was required by Federal law to track every AFX device from distribution to implantation. See 21 CFR § 821.

70.   Additionally, according to Endologix, at least one of its sales representatives was physically present at every AAA device implant procedure.

14

71.     Third, Endologix provided physicians with a false reporting rate of Type III endoleaks with the AFX device based upon its inaccurate adverse event reporting and/or its inconsistent methodology.

72.     As described above, the AFX system consists of multiple devices including "primary" unibody bifurcated stent grafts, as well as separate "accessory" proximal cuff limb stent grafts and extension stent grafts. The devices are all individually packaged and sold independently, have their own distinct indications, and separate Instructions for Use.

73.     The FDA provides that if a manufacturer becomes aware that more than one of its devices may have been involved in a reportable event it "must prepare and submit a complete Form FDA 3500A for each suspect device. Each Form FDA 3500A will be given a separate Manufacturer Report Number." See, Form FDA 3500A; 79 Fed. Reg. 8832.

74.     Nevertheless, Endologix only submitted one report when reporting adverse events of Type III endoleaks regardless of whether one or more of its graft devices were implicated in the event. In fact, Defendant specifically designated in reports that only one device was involved even when the event description made it clear that a bifurcated device as well as accessory devices were also involved.[4]

75.     Endologix however took the opposite position in its annual report to

---

[4] See examples:

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=3689228&pc=MIH

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=3128614&pc=MIH

https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfMAUDE/Detail.CFM?MDRFOI__ID=3343006&pc=MIH

physicians and considered all the devices, whether bifurcated grafts or accessory grafts, to be distinct and separate devices.

76.     Upon information and belief, Endologix considered the devices as one to reduce the number of AFX Type III endoleaks it reported, but then considered the devices as separate to generate a larger total number of distributed devices so that it could calculate and provide physicians with a reduced and false reporting rate. At a minimum, if Endologix considered the bifurcated devices and any accessory devices used in a procedure to be a single device for event reporting purposes, then Defendant should have been consistent and provided that amount as the number of distributed AFX devices and calculated reporting rates therefrom.

77.     Endologix's actions in describing the products as a single device for adverse event reporting purposes, but as separate when calculating and providing a reporting rate to physicians, was misleading.

78.     Finally, despite a plainly increased rate of Type III endoleaks specifically linked to the AFX system, Endologix repeatedly and falsely informed doctors in its annual user reports to physicians that:

> "From all reports received by Endologix, the worldwide commercial experience to date demonstrates that the Powerlink and AFX systems continue to perform as safe and effective treatments of abdominal aortic aneurysms. Consistent with the controlled clinical study experience, stent graft integrity has been excellent."

79.     Endologix has not provided an updated clinical report to physicians since its 2015 report.

80.     As a result of Defendant's failure to comply with all of the FDA's Conditions of Approval, including but not limited to its false reporting to physicians,

Defendant's AFX system was misbranded, adulterated, and/or defective resulting in a Type III endoleak and injuries to Plaintiff.

81.    Pursuant to 21 C.F.R. Part 803.50, manufacturers must report adverse events associated with a medical device to FDA within 30 days after the manufacturer becomes aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to death or serious injury if the malfunction was to recur. Such reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession. In addition, manufacturers are responsible for conducting an investigation of each adverse event, and must evaluate the cause of the adverse event.

82.    Pursuant to 21 C.F.R. Part 803.52, manufacturers of medical devices must also describe in every individual adverse event report whether remedial action was taken in regard to the adverse event, and whether the remedial action was reported to the FDA as a removal or correction of the device.

83.    Pursuant to 21 C.F.R. Part 803.53, manufacturers must report to the FDA in five business days after becoming aware that a medical device reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health. Medical device reportable events require the manufacturer to conduct a trend analysis that necessitates remedial action to prevent an unreasonable risk of substantial harm to public health.

84.    Pursuant to 21 CFR § 806 and 21 U.S.C. § 360i, medical device

manufacturers must report promptly to the FDA any device corrections and removals, and maintain records of device corrections and removals.

85.    21 CFR § 806(d) defines a correction as the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location.

86.    21 CFR § 806(j) defines a removal as the physical removal of a device from its point of use to some other location for repair, modification, adjustment, relabeling, destruction, or inspection.

87.    FDA regulations require submission of a written report within ten working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of federal law caused by the device that may present a risk to health. The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken, and any illness or injuries that have occurred with use of the device, including reference to any device report numbers. Manufacturers must also indicate the total number of devices manufactured or distributed which are subject to the correction or removal, and provide a copy of all communications regarding the correction or removal. See 21 C.F.R. Part 806.10. A device that fails to report such information is deemed to be misbranded. See. 21 U.S.C. § 352(t) & 21 U.S.C. § 360i(g).

88.    Pursuant to 21 CFR § 7.49(a) and 21 CFR § 820.100, a manufacturer that initiates a correction or removal is responsible for ensuring the effectiveness of the action and promptly notifying each of its affected direct accounts about the action.

89.     Upon information and belief, Defendant failed to comply with federal regulations regarding its initiation and communication of corrective and removal actions for its AFX device.

90.     Endologix stated in its July 20, 2018 letter to physicians:

> Endologix has taken a number of actions in recent years to address Type III endoleaks with the AFX System. These have included changes to the system's Instructions for Use as well as implemented product modifications intended to help prevent the occurrence of Type III endoleaks such as changing from the original graft material processing referred to as Strata (AFX system with Strata) to an improved process known as Duraply (AFX System with Duraply).

91.     Pursuant to 21 CFR § 806 these activities described in Endologix's July 20, 2018 letter constituted corrective and/or removal actions.

92.     Pursuant to 21 CFR § 806 these activities described in Endologix's July 20, 2018 letter constituted corrective and/or removal actions that should have been reported to the FDA and communicated to the Plaintiff and his physician.

93.     Had Endologix followed the required removal/corrective action notification and communication regulations, Plaintiff Hayes would not have been implanted with the defective device that resulted in his injuries.

94.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice (CGMP), as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in

compliance with federal law. See 21 U.S.C. § 360j(f).

95.     The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 et seq. As explained in the Federal Register, manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

96.     Pursuant to 21 CFR § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Food Drug & Cosmetic Act ("the Act") (21 U.S.C. § 351).

97.     Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. See 21 CFR § 820.3(v).

98.     Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

99.     Pursuant to 21 CFR § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

100.     Pursuant to 21 CFR § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an

adequate evaluation of conformance to design input requirements.

101.   Pursuant to 21 CFR § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

102.   Pursuant to 21 CFR § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

103.   Pursuant to 21 CFR § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

104.   Pursuant to 21 CFR § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

105.   Pursuant to 21 CFR § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

106.  Pursuant to 21 CFR § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a

result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include:

a.   Documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production;

b.   Monitoring and control of process parameters and component and device characteristics during production;

c.   Compliance with specified reference standards or codes;

d.   The approval of processes and process equipment; and

e.   Criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

107.   Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

108.   Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

109.   Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

110.   Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

111.   Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

112.   Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate compute software for its intended use according to an established protocol.

113.   Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

114.   Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. See 21 CFR § 820.3(z)(1).

115.   Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each

manufacturer shall ensure that validated processes are performed by qualified individuals.

116.   Pursuant to 21 CFR § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

117.   Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.   The procedures shall include requirements for:

   a.   Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems;

   b.   Investigating the cause of nonconformities relating to product, processes, and the quality system

   c.   Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

   d.   Verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

   e.   Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

   f.   Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

   g.   Submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

118.   Upon information and belief, Defendant's AFX system is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established

24

performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See 21 U.S.C. § 351.

119. Upon information and belief, Defendant's AFX system is adulterated pursuant to 21 U.S.C. § 351 because Defendant failed to establish and maintain CGMP for its AFX system in accordance with 21 CFR § 820 et seq. as set forth above.

120. Upon information and belief, Defendant failed to establish and maintain CGMP with respect to quality audits, quality testing and process validation for its AFX system.

121. Upon information and belief, Endologix did not conduct any adequate clinical studies to establish the safety of the AFX System under actual or simulated use conditions. In fact, Defendant specifically endeavored to avoid doing any such safety studies. During the Defendant's Q2 2010 earnings call John McDermott, the President and CEO of Endologix, stated that for the AFX system made with Strata "our hope is that the clinical studies will not be required and we will be able to enter both the Europe and U.S. in 2011." Despite knowing that its AFX grafts would remain implanted in patients permanently, Endologix failed to determine the long-term performance, durability, and safety of the device.

122. Upon information and belief, as previously described Endologix also failed to adequately report, monitor, and investigate reports of Type III endoleaks with the AFX device.

123. As a result of Defendant's failure to establish and maintain CGMP, Defendant's AFX system was defective and failed, resulting in a Type III endoleak and

25

injuries to Plaintiff.

124.   If Defendant had complied with the federal requirements regarding CGMP, Defendant's AFX system would have been designed/manufactured properly such that it would not have failed and/or been implanted into Plaintiff and would not have resulted in injuries to Plaintiff.

125.   Upon information and belief, Defendant's AFX system was adulterated because, among other things, it failed to meet represented specifications and/or failed to perform as represented. See 21 U.S.C. § 351. According to the Defendant, due to an increase in Type III endoleaks it discontinued the AFX device made with Strata in July 2014. Further, by at least December 2016, Defendant, recognizing that the device was dangerous to health when used in the manner prescribed, recommended, suggested, and/or failed to meet performance standards, removed all such devices from the market. The FDA has identified that "the use of [the AFX systems made with Strata] may cause serious injuries and death" and has issued a Class I recall of the device.

126.   Upon information and belief, Defendant's AFX system was misbranded because, among other things, it was dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. § 352. According to the Defendant, due to an increase in Type III endoleaks it discontinued the AFX device made with Strata in July 2014. Further, by at least December 2016, Defendant, recognizing that the device was dangerous to health when used in the manner prescribed, the Defendant recommended or suggested, and removed all such devices from the market. The FDA has identified that "the use of [the AFX systems

made with Strata] may cause serious injuries and death" and has issued a Class I recall of the device.

127.    Endologix is prohibited by the FDA and/or federal law from distributing, marketing, and/or selling AFX devices made with Strata in the United States.

128.    21 U.S.C. § 360k(a) does not preempt Plaintiff's claims.

129.    Plaintiff Hayes' claims assert conduct that both violates the Food Drug and Cosmetic Act and gives rise to recovery under Kentucky law in the absence of the Food Drug and Cosmetic Act.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY: DEFECTIVE MANUFACTURING

130.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

131.    Defendant is the manufacturer, designer, distributor, seller, and/or supplier of aortic treatment devices, including the Endologix AFX system for use in AAA repair.

132.    The Endologix AFX system manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendant, was defective in its manufacture and construction when it left the hands of Defendant in that it deviated from product specifications and/or applicable federal requirements for these medical devices, posing a serious risk of injury and death.

133.    The device was manufactured in a manner violative of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 et seq. and applicable FDA regulations. The facilities or controls used by Defendant in the manufacture, packing, storage, or

installation of the devices were not in conformity with applicable regulations and FDA-approved specifications for the device or the CGMP requirements set forth in FDA's quality system regulations, 21 C.F.R. Part 820.

134.   As a direct and proximate result of Plaintiff James Hayes's use Defendant's AFX system, as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant and/or the failure to comply with federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

135.   Defendant is strictly liable for selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improperly manufactured condition in violation of Kentucky law and parallel federal requirements.

136.   Defendant's actions and omissions as alleged in this Complaint constitute a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

**SECOND CAUSE OF ACTION**
**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

137.   Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

138.   Defendant is the manufacturer, designer, distributor, seller, and/or supplier of aortic treatment devices, including the Endologix AFX system for use in AAA repair.

139.   The Endologix AFX system manufactured and supplied by Defendant was defective in design or formulation in that, when it left the hands of the Defendant,

28

the foreseeable risks of the product exceeded the benefits associated with its design or formulation, or it was more dangerous than an ordinary consumer would expect, and/or it failed to comply with federal requirements for these medical devices.

140. The foreseeable risks associated with the design or formulation of the Endologix AFX system, include, but are not limited to, the fact that the design or formulation of the Endologix AFX system is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or it failed to comply with federal requirements.

141. Multiple other products with safer alternative designs exist that are approved to treat AAA with comparable or better efficacy, including but not limited to the Zenith endograft (Cook Medical) and Excluder endograft (Gore Medical).

142. FDA's initial approval of the Endologix AFX system device does not insulate Defendant from liability for injury or harm caused by use of the product due to design defect, because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

143. The allowance of damages under Kentucky law for harm caused by a defectively designed medical device that FDA has determined is a hazard to human health and subject to a Class 1 recall, provides a parallel remedy for a violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

144. The allowance of damages under Kentucky law for harm caused by a defectively designed medical device that remained on the market due to a manufacturer's failure to comply with federal requirements, provides a parallel remedy

for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

145.   As a direct and proximate result of Plaintiff James Hayes's use of the Endologix AFX system, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendant and/or its failure to comply with federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

146.   Defendant is strictly liable for selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improper condition in violation of Kentucky law and parallel federal requirements.

147.   Defendant's actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY:
### DEFECT DUE TO INADEQUATE WARNING

148.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

149.   Defendant is the manufacturer, designer, distributor, seller, and/or supplier of aortic treatment devices, including the Endologix AFX system for use in AAA repair.

150.   The Endologix AFX system manufactured, designed, marketed, distributed and sold by Defendant was defective due to inadequate warning or

instruction because at the time it left the control of Defendant and was supplied to Plaintiff James Hayes, Defendant knew or should have known that its product was unreasonably dangerous, as confirmed by its own internal data, because the AFX device substantially and significantly increases the risk of Type III endoleaks compared to other treatment options for AAA repair. Despite this knowledge, Defendant failed to adequately warn of the increased risk or provide adequate instructions for the devices safe use.

151.    Multiple other products with safer alternative designs exist that are approved to treat AAA with comparable or better efficacy, including but not limited to the Zenith endograft (Cook Medical) and Excluder endograft (Gore Medical).

152.    FDA's initial approval of the Endologix AFX system device does not insulate Defendant from liability for injury or harm caused by use of the product due to failure to adequately warn or instruct, because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

153.    The allowance of damages under Kentucky law for harm caused by a medical device that fails to provide adequate warning or instruction, in that FDA has determined the Endologix AFX system device is a hazard to human health and subject to a Class 1 recall, and therefore Kentucky law provides a parallel remedy for a violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

154.    The allowance of damages under Kentucky law for harm caused by the Endologix AFX system device that failed to provide adequate warnings and instructions for use, and that remained on the market due to a manufacturer's failure to

comply with federal requirements, provides a parallel remedy for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

155.   As a direct and proximate result of Plaintiff Hayes's use of the Endologix AFX system as manufactured, designed, marketed, distributed, and sold by Defendant and/or its failure to comply with applicable federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

156.   Defendant is strictly liable for selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improper condition in violation of violation of Kentucky law and parallel federal requirements.

157.   Defendant's actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE

158.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

159.   Defendant had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Endologix AFX system into the stream of commerce, including a duty to assure that its product did not pose a significantly increased risk of bodily harm and adverse events and/or a duty to comply with federal and state requirements.

160.   Defendant failed to exercise ordinary care in the design, formulation,

manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of the Endologix AFX system into interstate commerce in that Defendant knew or should have known that the product caused significant bodily harm and was not safe for use by consumers, and/or through failure to comply with federal and state requirements.

161.   Despite the fact that Defendant knew or should have known that the Endologix AFX system, posed a serious risk of bodily harm to consumers, Defendant continued to manufacture and market the Endologix AFX system for use by consumers and/or continued to fail to comply with federal and state requirements.

162.   Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care as described above, including the failure to comply with federal and state requirements.

163.   FDA's initial approval of the Endologix AFX system device does not insulate Defendant from liability for injury or harm caused by use of the product due to design defect or failure to warn or instruct, because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

164.   The allowance of damages under Kentucky law for harm caused by a defectively designed medical device and/or a medical device that fails to provide adequate warning or instruction that FDA has determined is a hazard to human health and subject to a Class I recall provides a parallel remedy for a violation of a federal standard and does not conflict with the oversight of medical devices by the federal

government.

165.   The allowance of damages under Kentucky law for harm caused by a defectively designed medical device and/or a device that failed to provide adequate warnings and instructions for use that remained on the market due to manufacturer's failure to comply with federal requirements, provides a parallel remedy for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

166.   As a direct and proximate result of Defendant's negligence, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

167.   Defendant is liable for negligently selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improper condition in violation of Kentucky law and parallel federal requirements.

168.   Defendant's actions and omissions as alleged in this Complaint demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## FIFTH CAUSE OF ACTION
## NEGLIGENCE PER SE

169.   Plaintiff hereby incorporates by reference all paragraphs of Plaintiff's Complaint as if fully set forth herein.

170.   Defendant has an obligation not to violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, distribution, advertising, preparing for use, warning of the risks and dangers of the Device.

34

171.   Defendant's acts described above constitute an adulteration, misbranding, or both, as defined by the Federal Code 21 U.S.C. § 351, 21 U.S.C. § 352, and other applicable FDA regulations, and constitute a breach of duty subjecting Defendant to civil liability for all damages arising therefrom and from parallel state law requirements, under the theory of negligence per se.

172.   Kentucky state law requirements regarding medical devices, as stated in Ky. Rev. Stat. § 217.175, provide that the following acts and the causing thereof within the Commonwealth of Kentucky are prohibited:

> (1) The manufacture, sale, or delivery, holding or offering for sale of any food, drug, device, or cosmetic that is adulterated or misbranded;
>
> (2) The adulteration or misbranding of any food, drug, device, or cosmetic;
>
> (3)  The receipt in commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise;
>
> (4) The sale, delivery for sale, holding for sale, or offering for sale of any article in violation of KRS 217.075;
>
> (5) The dissemination of any false advertisement;
>
> (6) The refusal to permit entry or inspection, or to permit the taking of a sample or to permit access to records or evidence, as authorized by KRS 217.155;
>
> (7) The giving of a guaranty or undertaking which guaranty or undertaking is false, except by a person who relied on a guaranty or undertaking to the same effect signed by, and containing the name and address of the person residing in the Commonwealth of Kentucky from whom he received in good faith the food, drug, device, or cosmetic;
>
> (8) The removal or disposal of a detained or quarantined article in violation of KRS 217.115;
>
> (9) The alteration, mutilation, destruction, obliteration, or removal of the

35

whole or any part of the labeling of, or the doing of any other act with respect to a food, drug, device, or cosmetic, if such act is done while such article is held for sale and results in such article being adulterated or misbranded;

173.   Ky. Rev. Stat. § 446.070  further provides that a person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation. This statue was enacted by the Kentucky General assembly to codify common law negligence per se.

174.   Plaintiff, as a purchaser of the Defendant's device, is within the class of persons the statutes and regulations described above are designed to protect, and Plaintiff's injuries are the type of harm these statutes and regulations are designed to prevent.

175.   FDA's initial approval of the Endologix AFX system device does not insulate Defendant from liability for violations of the Kentucky Revised Statutes for sale of an adulterated or misbranded device because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

176.   As a direct and proximate result of Defendant's breach of both federal and parallel Kentucky statutory requirements, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

177.   Defendant is liable for negligently selling and distributing medical devices in an unsafe, defective, unreasonably dangerous, and/or improper condition in violation of Kentucky law and parallel federal requirements.

178.   Defendant's actions and omissions as alleged in this Complaint

demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

### SIXTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY

179.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

180.   Defendant expressly warranted that the Endologix AFX system was a safe and effective aortic repair device for patients requiring an AAA repair.

181.   Defendant on its website and marketing materials expressly warranted that the Strata graft material had "exceptional strength and impermeability" and "Provide[d] both strength and seal."

182.   Defendant on its website and marketing materials expressly warranted that the AFX Endovascular AAA System had "proven clinical performance of anatomical fixation" and "advanced clinical performance."

183.   Plaintiff and/or Plaintiff's physicians reasonably relied upon the representations of Defendant when choosing the Endologix AFX system for use in Plaintiff's AAA repair surgery.

184.   The Endologix AFX system, manufactured and sold by Defendant, did not conform to these express representations.

185.   The AFX system was not a safe and effective aortic repair device for patients requiring an AAA repair. It caused serious injury to Plaintiff when used as recommended and directed.

186.   The Strata graft material failed to provide the warranted strength and seal. As discussed above, the AFX devices made with Strata pose a significantly

increased risk of Type III endoleaks.

187.    The AFX system did not have "proven" or "advanced" clinical performance, as Endologix did not conduct any adequate clinical studies on the AFX device made with Strata and the studies cited by Defendant for these statements were conducted on a differently designed and manufactured device.

188.    FDA's initial approval of the Endlogoix AFX system device does not insulate Defendant from liability or harm for breach of express warranty because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

189.    The allowance of damages under Kentucky law for harm caused by breach of express warranty when FDA has determined the device is a hazard to human health and subject to a Class I recall provides a parallel remedy for a violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

190.    The allowance of damages under Kentucky law for harm caused by breach of express warranty when the device remained on the market due to a manufacturer's failure to comply with federal requirements provides a parallel remedy for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

191.    As a direct and proximate result of Defendant's breach of warranty, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

192.    Defendant's actions as alleged in this Complaint demonstrate a flagrant

disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## SEVENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

193.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

194.   At the time Defendant designed, manufactured, marketed, sold, and distributed the Endologix AFX system used by Plaintiff James Hayes, Defendant knew of the use for which the Endologix AFX system was intended and impliedly warranted the product to be of merchantable quality and safe for such use and that its design, manufacture, labeling, and marketing complied with all applicable federal requirements.

195.   Plaintiff and/or Plaintiff's physicians reasonably relied upon the skill and judgment of Defendant as to whether the Endologix AFX system was of merchantable quality and safe for its intended use and upon Defendant's implied warranty as to such matters, including that it was in compliance with all federal requirements.

196.   Contrary to such implied warranty, Endologix AFX system was not of merchantable quality or safe for its intended use, because the product was defective as described above, and/or it failed to comply with federal requirements.

197.   FDA's initial approval of the Endologix AFX system device does not insulate Defendant from liability or harm for breach of implied warranty because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

198.   The allowance of damages under Kentucky law for harm caused by

breach of implied warranty when FDA has determined the device is a hazard to human health and subject to a Class I recall provides a parallel remedy for violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

199.    The allowance of damages under Kentucky law for harm caused by breach of implied warranty when the device remained on the market due to a manufacturer's failure to comply with federal requirements provides a parallel remedy for a violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

200.    As a direct and proximate result of Defendant's breach of warranty, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

201.    Defendant's actions as alleged in this Complaint demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

202.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

203.    In the exercise of reasonable care, Defendant should have known that its Endologix AFX system failed to comply with federal requirements for safe design and manufacture and/or was in other ways out of specification, yet Defendant negligently misrepresented to Plaintiff and/or Plaintiff's physicians that its device was safe and met all applicable design and manufacturing requirements in violation of Kentucky law and

40

parallel federal requirements.

204.   Plaintiff reasonably relied to Plaintiff's detriment upon Defendant's misrepresentations and omissions in its labeling, advertisements, and promotions concerning the serious risks posed by these products. Plaintiff reasonably relied upon Defendant's representations to Plaintiff and/or Plaintiff James Hayes's health care providers that the Endologix AFX system was safe for use.

205.   Plaintiff reasonably relied to his detriment upon Defendant's misrepresentations and omissions in its labeling, advertisements, and promotions concerning the benefits of these products. Plaintiff reasonably relied upon Defendant's representations to Plaintiff and/or Plaintiff James Hayes's health care providers that the Endologix AFX system possessed beneficial characteristics such as providing "exceptional strength and impermeability" when in reality it did not.

206.   FDA's initial approval of the Endologix AFX system device does not insulate Defendant from liability for negligent misrepresentation because FDA has determined that the device is dangerous to health and safety when used as directed and required a Class I recall.

207.   The allowance of damages under Kentucky law for harm caused by negligent misrepresentation when FDA has determined the device is a hazard to human health and subject to a Class I recall provides a parallel remedy for violation of a federal standard and does not conflict with the oversight of medical devices by the federal government.

208.   The allowance of damages under Kentucky law for harm caused by negligent misrepresentation when the device remained on the market due to a

manufacturer's failure to comply with federal requirements provides a parallel remedy for violation of federal standards and does not conflict with the oversight of medical devices by the federal government.

209.   As a direct and proximate result of Defendant's negligent misrepresentations and/or its failure to disclose its violations of federal requirements applicable to its Endologix AFX system, Plaintiff Hayes used Defendant's AFX system and Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and future economic loss.

210.   Defendant's actions as alleged in this Complaint demonstrate a flagrant disregard for human life, malice, and aggravated and egregious fraud, so as to warrant the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1) Compensatory damages in excess of the jurisdictional amount;

2) Economic damages in the form of medical expenses, out of pocket expenses, lost wages, and other economic damages in an amount to be determined at trial of this action;

3) Punitive damages;

4) Attorneys' fees, expenses, and costs of the action; and

5) Such further relief as the Court deems necessary, just, and proper.

Respectfully submitted,

/s/ Melanie S. Bailey
Melanie S. Bailey (86679)
**BURG SIMPSON ELDREDGE
HERSH & JARDINE, P.C.**
312 Walnut Street, Suite 2090
Cincinnati, OH 45202
Phone: (513) 852-5600
Fax: (513) 852-5611
E-mail: mbailey@burgsimpson.com

*COUNSEL FOR PLAINTIFF*

Janet G. Abaray
Kenneth M. Daly
**BURG SIMPSON ELDREDGE
HERSH & JARDINE, P.C.**
312 Walnut Street, Suite 2090
Cincinnati, OH 45202
Phone: (513) 852-5600
Fax: (513) 852-5611
E-mail: jabaray@burgsimpson.com
         kdaly@burgsimpson.com

*OF COUNSEL*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable

/s/ Melanie S. Bailey
Melanie S. Bailey (86679)